IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

UNITED STATES OF AMERICA          )
                                  )
v.                                )          CRIM. NO. 23-00039-JB-N
                                  )
ANTHONY LEE JACKSON               )

## UNITED STATES' RESPONSE

The United States, by and through Sean P. Costello, the United States Attorney for the Southern District of Alabama, respectfully urges this Court to deny Anthony Lee Jackson's ("Jackson's") motion to dismiss. [Doc. 46]. Congress passed 18 U.S.C. § 922(g)(1) to disarm convicted felons like Jackson. Section 922(g)(1) is constitutional under existing Eleventh Circuit precedent, and it fits neatly within the history and tradition of firearm regulations in the United States.

## I.    Background

A federal grand jury in the Southern District of Alabama returned a superseding indictment that charged Jackson with the unlawful possession of a firearm on two separate occasions. [Doc. 31]. According to the superseding indictment, Jackson has amassed a series of prior felony convictions, including convictions for receipt of stolen property and numerous drug distribution convictions. [*Id.* at 1–2, PageID.104–05]. Jackson moved to dismiss the superseding indictment. [Doc. 46]. This Court ordered the United States to respond. [Doc. 47] (text only order).

1

## II.    Legal Standards

A defendant may raise a defense before trial if the Court can decide the issue "without a trial on the merits." Fed. R. Crim. P. 12(b)(1). To mount a facial challenge to a federal statute, a challenger typically must show that the statute is unconstitutional in all its applications. *United States v. Salerno*, 481 U.S. 739, 745 (1987). A ruling by the Eleventh Circuit on an issue remains decisive unless and until the Supreme Court or the Eleventh Circuit sitting *en banc* overrules that decision. *United States v. Steele*, 147 F.3d 1316, 1317–18 (11th Cir. 1998) (*en banc*) ("Under our prior precedent rule, a panel cannot overrule a prior one's holding even though convinced it is wrong.").

## III.    Legal Discussion

Section 922(g)(1) is constitutional. Congress may prohibit a convicted felon from possessing a firearm or ammunition that affects interstate commerce. The Second Amendment protects the right "of an ordinary, law-abiding citizen" to possess firearms for typical self-defense purposes. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022). This protection, however, does not extend to convicted felons like Jackson. The Eleventh Circuit previously upheld the constitutionality of § 922(g)(1), and that decision remains good law after *Bruen*. *United States v. Rozier*, 598 F.3d 768, 771 (11th Cir. 2010); *see also United States v. Pelfrey*, No. 1:23-cr-00054-JB-N, ECF No. 33 (Aug. 15, 2023) (Beaverstock, C.J.) (concluding that *Bruen* did not disturb the existing framework as to felons) *and United States v. Mitchell*, No. 1:22-cr-00111-KD-

2

B, 2022 WL 17492259, at *1 (S.D. Ala. Nov. 17, 2022) (DuBose, J.) (rejecting a post-*Bruen* challenge to § 922(g)(1)).  Jackson's motion fails as both a facial challenge and as an as-applied one.  Accordingly, this Court should deny Jackson's motion to dismiss the superseding indictment.

## A.    The Second Amendment Protects Law-Abiding Citizens, not Felons.

Law-abiding citizens have a right to carry firearms in many circumstances.  Non-law-abiding citizens such as felons, however, do not enjoy a corresponding privilege. The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. Amend. II.  The Supreme Court has concluded that the Second Amendment is an individual right, but the Court consistently has construed the right as a protection only for law-abiding citizens.

Like other constitutional rights, the Second Amendment is an individual right. *District of Columbia v. Heller*, 554 U.S. 570, 595, 635 (2008).  It applies to states as well as to the federal government.  *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).  Just as other rights have limitations, the Second Amendment has limits, too.  *Heller*, 554 U.S. at 595.  The Second Amendment confers a right to law-abiding citizens to possess common guns in many circumstances.  Convicted felons have no such right.

The law-abiding limitation derives not from the meaning of "the people" but instead from the phrase "shall not be infringed," which modified the "right" that was at issue.  U.S. Const. Amend. II.  A directive that a right shall not be infringed signals that the right at issue already exists.  *Heller*, 554 U.S. at 592 (explaining that this phrase "implicitly recognizes the pre-existence of the right").  To discern the contours of the Second Amendment, it is appropriate to turn to its "predecessor" in the English Declaration of Rights.  *Id.* at 593.

The protection in the English Declaration of Rights did not protect everyone. Instead, it limited the disarmament of Protestant subjects of the kingdom.  *Id.*  By its terms, the English provision "was an individual right not available to the whole population, given that it was restricted to Protestants, and like all written English rights it was held only against the Crown, not Parliament."  *Id.*  For example, the English right did not protect Catholics.  *Id.* at 582.  The English government's disarmament of Catholics had a close connection to that government's views on loyalty and criminality. The *Heller* Court, relying on Blackstone, described the firearm prohibition for Catholics as a sanction for those who received convictions for failure to attend services in the Church of England.  *Id.*  Thus, it follows that the English did not perceive the Declaration of Rights to stand in the way of regulations on persons the government deemed to be criminal actors.

To be clear, a criminal penalty or firearm regulation that discriminates based on religion or any other protected characteristic would not pass muster today. Such a law would be invalid, however, because other constitutional and statutory provisions now protect against such discrimination. Laws like the English Declaration of Rights still are relevant to the analysis of the Second Amendment because these restrictions shed light on how the framers viewed the impact of this particular provision. *See United States v. Rowson*, - - - F. Supp. 3d - - - -, No. 22 Cr. 310 (PAE), 2023 WL 431037, at *22 (S.D.N.Y. Jan. 26, 2023) (explaining that "the Second Amendment's inquiry into historical analogues is not a normative one" and that past laws can illuminate the original meaning of the Second Amendment even if they would be invalid today).

*Heller*'s historical analysis reveals that the Second Amendment protects only the law-abiding, not lawbreakers like Jackson. The *Heller* Court went on to note expressly that its ruling did not cast doubt on settled prohibitions such as the disarmament of felons. 554 U.S. at 626–27. Jackson emphasizes that *Heller*'s language is *dicta* because *Heller* did not directly implicate a felon prohibition. [Doc. 46, 24–25, PageID.153–54]. The Eleventh Circuit has indicated that *Heller*'s general discussion on law-abiding individuals was part of its reasoning and has found its language to be persuasive in any event. *Rozier*, 598 F.3d at 771 n.6 (indicating that *Heller*'s general discussion of law-abiding individuals was part of its reasoning but that *Heller*'s discussion was persuasive in any event); *see also United States v. White*, 593 F.3d 1199, 1205–06 (11th Cir. 2010)

5

(treating the specific discussion of enumerated longstanding prohibitions as *dicta* but applying it in a challenge to 18 U.S.C. § 922(g)(9)).

Indeed, the status of *Heller*'s discussion as *dicta* does nothing to mute its persuasiveness. *Heller*'s acknowledgment that felon prohibitions are longstanding flows from its analysis of traditional restrictions, including the English Declaration of Rights. The *Heller* Court also sought to offer practical guideposts on the scope of its decision. Hence, the *Heller* Court's discussion of felon prohibitions is highly persuasive.

*Bruen* also followed *Heller*'s lead. *Bruen* repeatedly described the Second Amendment as a protection for law-abiding citizens. 142 S. Ct. at 2122, 2125, 2131, 2133, 2134, 2138, 2150, 2156. This approach makes sense both for the historical reasons outlined above and for practical ones as well. *Bruen* applied a presumption of validity to laws that regulate conduct that falls within the Second Amendment's text. Such a presumption may be reasonable for laws of general applicability that target the possession of firearms by law-abiding citizens. A governing body still may regulate law-abiding citizens, but, when it does so, the regulation must fit within the history and tradition of firearm regulations.

It makes little sense to apply such a presumption to laws that target criminal actors or to regulations that secure sensitive spaces such as prisons or courthouses. For example, it would strain credulity to suggest that an inmate has a presumptive right to

possess a firearm while in prison.  If the Court construes the Second Amendment's text to reach any citizen and any gun, however, *Bruen* would yield just such a presumption.

Nor should it carry the day to speculate that a government body would rebut the presumption in that case.  The point of a presumption is to promote efficiency and consistency in the law.  An extension of *Bruen*'s presumption beyond its appropriate reach inevitably would yield extensive litigation on an array of facial and as-applied constitutional challenges with little finality.  A presumption may fit for regulations that impact law-abiding citizens, but it should not extend to those restrictions that impact only citizens who have violated the law.

At bottom, the Second Amendment allows law-abiding citizens to carry firearms in many circumstances.  That protection does not extend to convicted felons.  This interpretation of the Second Amendment is the best reading of the Supreme Court's decisions in *Heller*, *McDonald*, and *Bruen*.  It accords with the historical foundation upon which these decisions built.

Jackson pushes past the repeated references to law-abiding citizens and attributes these statements to happenstance.  [Doc. 46, 13–18, PageID.142–47].  In essence, Jackson contends that *Bruen* set a floor instead of a ceiling.  Even if so, this argument only points to the many differences between that case and the present one.  *Bruen* involved general rights of gun access for law-abiding citizens.  Conversely, Jackson has multiple felony convictions.  Jackson's long criminal resume is neither ordinary nor law-

7

abiding. Even if *Bruen* intended to set a floor, Jackson has not shown that it intended to establish a ceiling that protects individuals like him. Separately, Jackson attacks this qualifier because it is too vague. Not so. *Bruen* merely meant that laws of general applicability that restrict all citizens warrant more careful scrutiny than laws that disarm only a discrete subset of the population. *Bruen*'s law-abiding qualifier accords with history and tradition as well as logic. This Court should conclude that the Second Amendment does not protect a convicted felon's right to carry a gun.

### B.    The Eleventh Circuit has Upheld § 922(g)(1).

The Eleventh Circuit has upheld the constitutionality of § 922(g)(1) in a post-*Heller* decision. *Rozier*, 598 F.3d at 771. On the heels of *Heller*, *Rozier* concluded that "statutory restrictions of firearm possession, such as § 922(g)(1), are a constitutional avenue to restrict the Second Amendment right of certain classes of people." *Id.* at 771. As *Rozier* noted, this interpretation of the Second Amendment was in keeping with other constitutional rights. *Id.* ("While felons do not forfeit their constitutional rights upon being convicted, their status as felons substantially affects the level of protection those rights are accorded."). *Bruen* did not overrule or undermine *Rozier*. Thus, *Rozier* is still good law.

*Bruen* did not undermine *Rozier* to the point of abrogation or directly contradict it. *See United States v. White*, 837 F.3d 1225, 1230–31 (11th Cir. 2016) (explaining the standard to set aside a prior panel's decision). On its face, *Bruen* only addressed the

8

rights of "law-abiding citizens with ordinary self-defense needs[.]" 142 S. Ct. at 2156. It said nothing about the rights of felons. Nor did *Bruen* overrule or contradict the language in *Heller* upon which *Rozier* relied.

*Bruen* tweaked the analysis for Second Amendment challenges by disapproving of a process commonly called "means-end scrutiny" in which a court would uphold a law that lacked a historical foundation if it served a sufficiently valid purpose. *Id.* at 2126–27. *Rozier* did not rely, however, on means-end scrutiny. Instead, the Court concluded that felons were not qualified to possess firearms. *Rozier*, 598 F.3d at 770–71. It cited *Heller*'s analysis of the prohibition and the established principle that a felony conviction affects an individual's rights. *Id.* at 770–71; *see also United States v. Jimenez-Shilon*, 34 F.4th 1042, 1053 (11th Cir. 2022) (Newsom, J., concurring) (citing *Rozier* as an example of a decision that upheld a prohibition on firearm possession without resorting to means-end scrutiny in a concurring opinion that questioned the viability of means-end scrutiny).

Jackson briefly asserts that *Bruen* abrogated *Rozier*. [Doc. 46, 28–29, PageID.157–58]. He is wrong. *Rozier* did not rely on means-end scrutiny. On the contrary, it relied on language in *Heller* that remains applicable after *Bruen*. Jackson also contends erroneously that *Rozier* offered no historical analysis. The *Rozier* Court simply looked to the careful discussion of longstanding prohibitions in *Heller*. *Bruen* did not contradict *Heller*'s discussion on these appropriate limitations.

9

This Court already has concluded that *Rozier* remains on solid footing after *Bruen*. *Pelfrey*, ECF. 33, at 2.  Other courts within this Circuit have reached the same conclusion. *See, e.g.*, *United States v. Meyer*, No. 22-10012-CR-ALTMAN, 2023 WL 3318492, at *2 (S.D. Fla. May 9, 2023) (applying *Rozier*), *United States v. Kirby*, No. 3:22-cr-26-TJC-LLL, 2023 WL 1781685, at *2–*3 (M.D. Fla. Feb. 6, 2023) (continuing to follow *Rozier*), *United States v. Isaac*, No. 5:22-cr-117-LCB-HNJ-1, 2023 WL 1415597, at *3–*4 (N.D. Ala. Jan. 31, 2023) (following *Rozier*), *and United States v. Hunter*, No. 1:22-cr-84-RDP-NAD-1, - - - F. Supp. 3d - - - -, 2022 WL 17640254, at *3–*6 (N.D. Ala. Dec. 13, 2022) (continuing to apply *Rozier*).  Given these authorities, this Court should continue to follow *Rozier*.

## C.   Section 922(g)(1) is Consistent with Traditional Regulations.

If this Court reaches the issue and applies *Bruen* scrutiny to § 922(g)(1), this statute readily passes.  Under *Bruen*, a modern regulation must have a reasonable historical analogue.  142 S. Ct. at 2132–33.  Typically, a court should consider how and why the regulation burdened "a law-abiding citizen's right to armed self-defense."  *Id.* at 2133.  This approach is not a "blank check" for regulations, but it is not a straitjacket, either.  *Id.*

The Court should compare § 922(g)(1) to two categories of regulations.  First, § 922(g)(1) is similar to other punishments that felons traditionally received.  Second, governments traditionally disarmed groups deemed to be unvirtuous or dangerous.

10

Both types of regulations support the constitutionality of § 922(g)(1).

### 1.   Early Governments had Broad Latitude to Punish Felons.

Disarmament has striking similarities to other punishments that felons typically faced.  At common law, felons frequently received the death penalty.  Even as this punishment evolved, felons continued to face stiff punishments, including the forfeiture of lands and goods.  From the Nation's early days, governments had expansive latitude to decide what constituted a felony and the punishment for that offense.  Given the significant punishments, early Americans also had little concern that convicted felons would possess firearms.

A felony offense typically had two associated punishments: forfeiture and death. Drawing on Blackstone's observations, the Supreme Court has recognized that the term "originally denoted the penal consequences of the crime, namely, the forfeiture of the lands and goods[.]"  *United States v. Staats*, 49 U.S. 41, 44 (1850); *see also Perry v. Man*, 1 R.I. 263, 265 (R.I. 1849) ("A felony at common law always drew after it a forfeiture of goods and chattels.").  Over time, the concept became intertwined with capital punishment.  *Staats*, 49 U.S. at 45.  As Congress enacted the earliest federal crimes, it imposed death as a sanction for various offenses, including counterfeiting.  Crimes Act of 1790, 1 Stat. 112, 115 (1790); *see also Gregg v. Georgia*, 428 U.S. 153, 177 (1976) (plurality opinion of Stewart, J.) ("[T]he First Congress of the United States enacted legislation providing death as the penalty for specified crimes.").  Indeed, capital punishment "was

'the standard penalty for all serious crimes.'" *Medina v. Whitaker*, 913 F.3d 152, 158 (D.C. Cir. 2019) (quoting *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring in the judgment)). Given the ubiquity of capital punishment, the founding generation had little reason to worry that felons would later access a gun. *Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 714 F.3d 334, 343 (5th Cir. 2013) (Jones, J., dissenting from the denial of rehearing *en banc*) (deeming "gun ownership by felons" to be a "non-issue" in the early Republic due to widespread capital punishment and forfeiture).

As death became less common, felony convictions still carried significant lasting consequences. At common law, a felon could not participate in society in the same fashion as non-felons. As the *Staats* Court explained, "[f]elony is the conclusion of law from the acts done with the intent described; and makes part of the punishment; as, in the eye of the common law, the prisoner becomes infamous, and disfranchised." 49 U.S. at 45. Although the Court recognized that this result might not follow strictly "in a government where the common law does not prevail," it nonetheless maintained that "the moral degradation attaches to the punishment actually inflicted." *Id.* An Ohio court referred to a felony conviction as a form of "civil death" in the context of its discussion of the governor's pardon authority. *Sutton v. McIlhany*, 1 Ohio Dec. Reprint 235, 237 (Ohio Ct. Com. Pleas 1848). A pardon was paramount to liberate a convicted

12

felon "from all disabilities." *Id.*  Thus, a felony conviction left a lifelong mark on a person's status.

For example, governments excluded felons from participation in the political process.  This Court has called felon disenfranchisement laws "deeply rooted in this Nation's history" as "a punitive device stemming from criminal law." *Johnson v. Gov. of Fla.*, 405 F.3d 1214, 1228 (11th Cir. 2005) (*en banc*).  As one example, Florida's first constitution authorized criminal disenfranchisement laws in 1838, and the Florida legislature enacted a disenfranchisement law in 1845.  *Id.* at 1218.  Other states had similar laws.  *Green v. Bd. of Elections of City of New York*, 380 F.2d 445, 450 (2d Cir. 1967) ("[E]leven state constitutions adopted between 1776 and 1821 prohibited or authorized the legislature to prohibit exercise of the franchise by convicted felons.").  Thomas M. Cooley likewise noted in his prominent treatise on constitutional law that felons fell among the categories of people typically excluded from the political process.  Thomas M. Cooley, *A Treatise on the Constitutional Limitations which Rest upon the Legislative Power of the States of the American Union*, 29 (2d ed. 1871) (available at: https://repository.law.umich.edu/books/10/ (last accessed September 19, 2023)).  The *Heller* Court cited other aspects of Cooley's treatise with approval and called it a "massively popular" work.  554 U.S. at 616–18.

Felons have faced additional consequences beyond disenfranchisement.  Although felons maintain certain constitutional rights, "their status as felons

substantially affects the level of protection those rights are accorded." *Rozier*, 598 F.3d at 771.  Courts typically evaluate constitutional issues through a different lens when the challenge involves a restriction on a felon.  *Id.* at 771 n.5.  Those approaches trace to the traditional understanding that felonies are infamous crimes with permanent impacts. *Staats*, 49 U.S. at 45.

Moreover, governments had broad leeway to define those offenses that qualified as felonies and therefore carried these far-reaching criminal consequences.  For example, the First Congress imposed death as a potential sanction for counterfeiting offenses.  Crimes Act of 1790, 1 Stat. 112, 115 (1790).  Similarly, English laws provided for capital punishment for both violent and non-violent crimes.  *Medina*, 913 F.3d at 158 ("Felony crimes in England at the time included crimes of violence, such as murder and rape, but also included nonviolent offenses that [one] would recognize as felonies today, such as counterfeiting currency, embezzlement, and desertion from the army."). Felonies under the common law also encompassed "a large class of high crimes, as well as those of a less atrocious character." *Perry*, 1 R.I. at 265.  Subsequently, the Supreme Court emphasized the broad power of the legislature to determine capital offenses as it evaluated a California statute that imposed capital punishment for those who committed certain assaults while serving a life prison sentence. *Finley v. People of Calif.*, 222 U.S. 28, 30 (1911) (quoting the statute).  The Court noted that "[t]he power of classification which the lawmaking power possesses has been illustrated by many cases

14

which need not be cited." *Id.* at 31.  Early lawmaking bodies had broad power to set the penalties for an offense.

The varied nature of felony offenses in the early Republic only underscores the extent of this discretion.  During the founding era, a wide range of offenses could qualify as felonies, including offenses that were not punishable by death.  *See United States v. Campbell*, 743 F.3d 802, 810–11 (11th Cir. 2014) (collecting and examining historical authorities on felony offenses for purposes of interpreting the Felonies Clause of the Constitution).  As America moved from a system grounded in the common law to one based on statutes, early courts recognized that legislatures had the power to define the consequences of a crime.  *The Caroline*, 5 F. Cas. 90, 91 (D. Va. 1819) ("To the legislature it belongs to define punishment as well as crime, and courts would certainly step very far beyond their province, were they to annex forfeiture to offences, to which the legislature had not annexed that penalty.").

Congress' decision to disarm felons in § 922(g)(1) sits neatly on top of this enduring historical lineage.  From its earliest days, Congress had broad power to set penalties for crimes, up to and including death.  Section 922(g)(1) serves similar purposes to these laws.  Punitive measures have long addressed the need to punish the offender and to protect the public.  Indeed, early governments imposed far more demanding sanctions for felony offenses.  Congress' power to disarm felons resembles the many other penalties that governments imposed for felonies during the founding

15

era. *See, e.g., United States v. Rice*, - - - F. Supp. 3d - - - -, No. 3:22-CR-36 JD, 2023 WL 2560836, at *10 (N.D. Ind. March 17, 2023) ("The Court concludes that § 922(g)(1) imposes a similar or lesser burden on the Second Amendment right compared to historic regulations restricting the rights of felons, and the burden is comparably justified.").

Section 922(g)(1) compares to traditional punishments for felons. Unlike during the founding era, most felons now return to society after release from prison and have opportunities to resume civil life. On that score, Jackson is wrong that he suggests that the problem of armed felons is similar to the issues of the founding era. [Doc. 46, 19, PageID.148]. The problems differed precisely because governments regulated felons in a more comprehensive fashion.

Guns pose a distinctive danger in the hands of a convicted felon, so § 922(g)(1) addresses this risk. The founding generation did not suffer from this hazard because early governments had adopted more severe and comprehensive criminal sanctions that separated felons from firearms in other ways. Nonetheless, governments in the founding era retained broad powers to decide on the punishments for criminal behavior. Thus, § 922(g)(1) regulates a relatively new social problem in a highly traditional legal fashion. The newness of the problem and the traditional nature of the regulation cut strongly in favor of its constitutionality. Accordingly, the Second Amendment allows Congress to disarm felons.

16

### 2.  Governments could Disarm Dangerous or Unvirtuous Citizens.

In addition, § 922(g)(1) is constitutional because it is consistent with traditional limitations on firearm possession.  The right set out in the Second Amendment "was not unlimited, just as the First Amendment's right of free speech was not[.]"  *Heller*, 554 U.S. at 595.  Thus, the Court did not interpret "the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as [it did] not read the First Amendment to protect the right of citizens to speak for *any purpose.*"  *Id.* (emphasis in the original).  A prohibition on felon possession falls within the traditional restrictions on firearm possession.

The Second Amendment does not "extend in the same fashion to persons outside the national polity."  *Jimenez-Shilon*, 34 F.4th at 1049.  As the United States explained above, felons traditionally were excluded from many civic aspects of the national polity, to include voting.  A prohibition on firearm possession is consistent with these other restrictions.

Felony convictions fall within the category of policy concerns that traditionally triggered firearm restrictions.  For example, *Heller* cited Blackstone's comment that "Catholics convicted of not attending service in the Church of England suffered certain penalties, one of which was that they were not permitted to keep arms in their houses."  554 U.S. at 582 (internal quotation marks omitted).  Similarly, the Eleventh Circuit has

noted colonial initiatives to disarm individuals based on concerns about loyalty, first disarming individuals who refused to affirm allegiance to the Crown and later disarming those who opposed the Revolution. *Jimenez-Shilon*, 34 F.4th at 1047–48 (collecting sources). Moreover, a commentator studied the history surrounding the Second Amendment observed that "the dominant understanding of the right to bear arms in the Founding era" construed it as a "civic right" that was "not something that all persons could claim, but was limited to those members of the polity who were deemed capable of exercising it in a virtuous manner." Saul Cornell, *"Don't Know Much About History" The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002).

Other early laws reinforce these points. Numerous jurisdictions disarmed groups that the government deemed to be dangerous or otherwise incapable of possessing firearms. *See, e.g.*, Act of Mar. 14, 1776, ch. VII, 1775-1776 Mass. Acts at 31–32, 35 (disarming those who would not participate in the American Revolution), An Ordinance Respecting the Arms of Non-Associators, § 1, 1776 Pa. Laws 11 (directing militia officers to disarm "non-associators"), Act of May 5, 1777, ch. 3, in 9 Hening's Statutes at Large 281, 281–82 (1821) (requiring loyalty oaths), An Act to Prohibit the Selling of Guns, Gunpowder, or Other Warlike Stores to the Indians, § 1, 1763 Pa. Laws 319 (1763) (prohibiting the sale of firearms to Native Americans), *and* An Act Prohibiting the Trading with Indians, § 2, in Nathaniel Pope, Laws of the Territory of

Illinois (1815) (prohibiting the trading of firearms and other hunting articles to Native Americans in 1813). This brief cites to the electronic versions of these authorities as available in the repository of firearms statutes at the Duke Center for Firearms Law. The Court may locate these statutes at: https://firearmslaw.duke.edu/repository/search-the-repository/ (last accessed September 19, 2023). Copies of these regulations are attached as exhibits to this response.

A felony conviction evinces a disregard for social order and a breach of the public trust that is akin to disloyalty or dangerousness that subjected classes of persons to firearm regulations. *See Jimenez-Shilon*, 34 F.4th at 1047–48 (noting historical disarmament based upon concerns about loyalty). Governments punish crimes to protect the public from breaches of the peace. This power has a fundamental connection to sovereignty itself. *See United States v. Lanza*, 260 U.S. 377, 382 (1922) ("It follows that an act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each."). Indeed, "the ability to protect citizens and punish wrongdoers" constitutes "the realm most central to sovereignty itself[.]" *United States v. Alvarado*, 440 F.3d 191, 197 (4th Cir. 2006). Criminal behavior is by its nature a breach of the peace and a threat to public order. *See Williamson v. United States*, 207 U.S. 425, 435–46 (1908) (addressing traditional

authorities that treated criminal behavior as a breach of the peace as part of an examination of a legislative privilege).

A contemporary regulation does not need a "historical twin" to withstand constitutional scrutiny. *Bruen*, 142 S. Ct. at 2133 (emphasis omitted). Section 922(g)(1) is constitutional because it is in good company with other historical firearm prohibitions. These traditional restraints certainly are broad enough to cover all felonies because crimes of this nature constitute breaches of peace and order.

Jackson points out that some of these provisions were insufficient to support the general licensing restrictions at issue in *Bruen*. [Doc. 46, 30–33, PageID.159–62]. His argument presupposes, however, a strong similarity between § 922(g)(1) and the licensing scheme in *Bruen*. The laws are much different. Section 922(g)(1) disarms a discrete group of individuals who pose distinct threats to society. The early disarmament of other groups that early legislatures deemed dangerous speaks to the accepted power of legislatures to set those boundaries. Even if many of those laws would not pass muster today for other reasons, they can shed light on the original understanding of the Second Amendment.

The United States has identified clear historical comparators to § 922(g)(1). This Court should deny Jackson's motion.

### 3.    Jackson has no As-Applied Challenge.

Finally, Jackson's arguments fare no better insofar as he attempts to recast them into an as-applied challenge.  The superseding indictment documents Jackson's long criminal resume.  His offenses include the receipt of stolen property and multiple charges of drug distribution.  Firearms have a longstanding and dangerous connection to the drug trade.  *See, e.g.*, *United States v. Pham*, 463 F.3d 1239, 1246 (11th Cir. 2006) (recognizing the ties between guns and the drug trade).  Jackson certainly poses a heightened danger to the public if he is armed.

The United States notes that the *en banc* Third Circuit accepted a defendant's as-applied challenge to § 922(g)(1).  *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023).  The plaintiff in *Range* sought a declaratory judgment that his 1995 false statement conviction could not constitutionally bar his possession of a firearm.  *Id.* at 99.  The *Range* court accentuated the narrow reach of that decision.  *Id.* at 106.  *Range* addressed a distant conviction for a false statement.  Jackson has committed multiple serious felonies.   He obtained many of those convictions in 2018 and 2019.  Accordingly, *Range* has no bearing on Jackson's circumstances.

*Range* also is unpersuasive, and this Court should not follow it.  The *Range* court brushed aside with little discussion the many persuasive decisions that consistently had adopted a contrary approach.  *Id.* at 106.  The court also applied a stringent analysis of historical laws that is incompatible with *Bruen*.  Put simply, *Range* created a regulatory

21

straitjacket. That approach is at odds with *Bruen*. 142 S. Ct. at 2133; *see also United States v. Jordan*, No. 1:23CR159, 2023 WL 4267602, at *2 (N.D. Ohio June 29, 2023) ("The Court declines to follow *Range* as it finds that the Supreme Court has been *consistently* clear that its Second Amendment jurisprudence has cast no doubt on the validity of the prohibitions on the possession of firearms by convicted felons." (emphasis in the original)).   Section 922(g)(1) satisfies *Bruen* scrutiny. It does not impact a law-abiding citizen's right to carry firearms, which is the touchstone of *Bruen*. *Id.* at 2133. Governments traditionally could disarm groups that the state deemed to be unvirtuous.

Jackson contends that he is not disloyal or treasonous.   [Doc. 46, 34, PageID.163]. His past felony convictions say otherwise. Indeed, Jackson's conduct evinces a high level of disloyalty toward the rule of law. In addition, his offenses are dangerous. Jackson makes a final salvo that deprivations of rights only correspond with a criminal sentence. This argument is not entirely correct, as the Eleventh Circuit has recognized that a person's status as a felon can have an impact on many constitutional rights. *Rozier*, 598 F.3d at 771 and n.5. Moreover, this point underscores the historical discretion of legislatures to establish those penalties. Congress' disarmament of felons compares to the traditional sanctions of a felony conviction.

Section 922(g)(1) is constitutional, both facially and as-applied in Jackson's case. This Court should deny the motion to dismiss.

## IV.    Conclusion

Section 922(g)(1) is constitutional.  This Court should deny the motion to dismiss the superseding indictment.

Respectfully submitted,

SEAN P. COSTELLO
UNITED STATES ATTORNEY
By:

*/s/ Scott A. Gray*
Scott A. Gray
Assistant United States Attorney
63 South Royal Street, Suite 600
Mobile, Alabama  36602
Telephone:  (251) 441-5845
Fax:  (251) 441-5131